# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PACT XPP SCHWEIZ AG

        Plaintiff,

   v.

INTEL CORPORATION

        Defendant.

Case No. 19-1006-JDW

**JURY TRIAL DEMANDED**

## PLAINTIFF PACT XPP SCHWEIZ AG'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT ON IPR ESTOPPEL AND DEFENDANT INTEL CORPORATION'S AFFIRMATIVE DEFENSES OF MARKING, COVENANT NOT TO SUE, INEQUITABLE CONDUCT, EQUITABLE ESTOPPEL, AND EXHAUSTION

# TABLE OF CONTENTS
## Page

INTRODUCTION .......................................................................................................... 1

I.      Stage of proceedings and summary of argument ............................................. 1

II.     LEGAL STANDARD ........................................................................................ 2

III.    Intel's invalidity grounds should be estopped under § 315(e)(2) ..................... 3

        A.    Legal Standards of § 315(e)(2) .............................................................. 4

        B.    Intel's Attempts to "Cloak" Printed Publications as System Art Alone or
              in Combination with Other Known Prior Art Patents Should Be Estopped ......... 4

              1.    Texas Instruments TMS320C80 System Is Cumulative to Balmer .......... 4

              2.    IBM's Power4 System Is Cumulative to the Power4 Redbook ................ 6

              3.    Intel's P6 System Is Cumulative to Intel's P6 Developer's Manual ........ 7

              4.    Sequent's Numa-Q Is Cumulative to Safranek and the P6 Manual .......... 8

              5.    Altera's Excalibur Is Cumulative to Excaliber/APEX Publications .......... 9

IV.     INTEL HAS NOT OFFERED EVIDENCE DISPUTING THAT THE LICENSEE
        PRODUCTS DO NOT PRACTICE THE '301 OR '047 PATENT ............................. 10

        A.    Legal Standard .................................................................................... 11

              1.    Patent Marking .......................................................................... 11

              2.    Meaning of "adapted to" or "adapted for" Claim Terms ..................... 11

        B.    The Licensee Products Are Not "adapted to" or "adapted for" Practicing
              the '301 or '047 Patent Claim Limitations ............................................... 13

              1.    The '301 Patent ......................................................................... 13

              2.    The '047 Patent ......................................................................... 14

        C.    PACT Is Entitled to Summary Judgment That There Has Been No Failure
              to Mark With Respect to the '301 and '047 Patents ................................... 16

V.      INTEL'S 7TH AFFIRMATIVE DEFENSE ("NO INFRINGEMENT DUE TO
        COVENANT NOT TO SUE) AND COUNTERCLAIM I ("BREACH OF
        CONTRACT") ................................................................................................ 16

VI.     THE COURT SHOULD DISMISS INTEL'S fifth and SIXTH AFFIRMATIVE
        DEFENSEs (exhaustion and EQUITABLE ESTOPPEL) ...................................... 18

VII.    The Court Should Dismiss Intel's Ninth Affirmative Defense of Inequitable
        Conduct .......................................................................................................... 20

        A.    Legal Standard for Inequitable Conduct ................................................... 21

        B.    Intel Cannot Establish That Messrs. Vorbach, Heller, and Grunberger
              Committed Inequitable Conduct By "Burying" the TI References ................... 22

1.      Intel Cannot Establish That The TMS320C80 References Were
        Material to Patentability..................................................................... 23

2.      Intel Cannot Establish That The Citation of the TI References in an
        IDS Was Specifically Intended to Deceive the PTO ............................. 25

C.      Intel Cannot Establish That Mr. Vorbach Committed Inequitable Conduct
        By Knowingly Filing False Inventorship Declarations....................................... 26

D.      Intel Cannot Establish That Messrs. Heller and Grunberger Committed
        Inequitable Conduct By Knowingly Filing False Inventorship Declarations ...... 28

E.      Intel Cannot Establish That Mr. Vorbach Committed Inequitable Conduct
        By Failing to Submit His and Rambus' Emails Regarding Lack of
        Inventorship and Lack of Support for the Asserted Claims............................... 29

VIII.   Conclusion.................................................................................................... 30

ii

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abbot Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009)..................................................................................... 22

*Arctic Cat v. Bombardier Rec. Prods.*,
876 F.3d 1350 (Fed. Cir. 2017)..................................................................................... 11

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012).............................................................................. 12, 13

*Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*,
No. CIV A 08-464, 2010 WL 3907490 (D. Del. Sept. 21, 2010) ................................... 20, 28

*California Inst. of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ....................................................................................... 24

*California Institute of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ......................................................................................... 4

*California Institute of Technology v. Broadcom Ltd.*,
2019 WL 8192255 (C.D. Cal. Aug. 9, 2019)..................................................................... 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................ 2

*Clearlamp, LLC v. LKQ Corp.*,
2016 WL 4734389 (N.D. Ill. Mar. 18, 2016)..................................................................... 4

*Esco Corp. v. Cashman Equip. Co.*,
158 F. Supp. 3d 1051 (D. Nev. 2016)............................................................................. 26

*Everlight Elecs. Co. v. Nichia Corp.*,
143 F. Supp. 3d 644 (E.D. Mich. Oct. 20, 2015).............................................................. 28

*Fiskars, Inc. v. Hung Mfg. Co.*,
221 F.3d 1318 (Fed. Cir. 2000)................................................................................. 22, 23

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996) .................................................................................. 26, 27

*Hollingsworth v. R. Home Property Management, LLC*,
498 F.Supp.3d 590 (E.D. Pa., 2020)............................................................................... 18

*In re Giannelli*,
739 F.3d 1375 (Fed. Cir. 2014)......................................................................... 10, 12, 13

*In re Man Mach. Interface Techs. LLC*,
    822 F.3d 1282 (Fed. Cir. 2016)............................................................................. 10, 12

*John Bean Technologies Corporation v. Morris & Associates, Inc.*,
    887 F.3d 1322 (Fed. Cir. 2018)..................................................................................... 19

*Lies v. Farrell Lines, Inc.*,
    641 F.2d 765 (9th Cir. 1981) .......................................................................................... 2

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
    244 F.3d 1365 (Fed. Cir. 2001)..................................................................................... 23

*Meyers v. Asics Corp.*,
    974 F.2d 1304 (Fed. Cir. 1992)..................................................................................... 19

*Milwaukee Electric Tool Corp. v. Snap-On, Inc.*,
    271 F. Supp. 3d 990 (E.D. Wis. 2017) ........................................................................... 4

*Neville v. Foundation Constructors, Inc.*,
    2019 WL 6894522 (C.D. Cal. 2019) ............................................................................. 19

*Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*,
    2019 WL 861394 (N.D. Ill. Feb. 22, 2019) .................................................................... 4

*ParkerVision, Inc. v. Qualcomm Inc.*,
    924 F. Supp. 2d 1314 (M.D. Fla. 2013)......................................................................... 26

*Podobnik v. United States Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005) .......................................................................................... 18

*Pridgen v. Green Valley SNF LLC*,
    756 F. Supp. 2d 614 (D. Del. 2010) ........................................................................... 2, 3

*Radio Systems Corp. v. Lalor*,
    709 F.3d 1124 (Fed. Cir. 2013)..................................................................................... 19

*Ricoh Co. v. Nashua Corp.*,
    185 F.3d 884 (Fed. Cir. Feb. 18, 1999) ........................................................................ 19

*Scripps Clinic & Research Foundation v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991)..................................................................................... 22

*Seaboard Int'l, Inc. v. Cameron Int'l. Corp.*,
    No. 1:13-CV-00281-MLH-SKO, 2013 WL 3936889 (E.D. Cal. 2013)............................... 23

*Symbol Techs, Inc. v. Aruba Networks, Inc.*,
    609 F. Supp. 2d 353 (D. Del. 2009) ......................................................................... 23, 24

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002)...................................................................... 11, 16

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276, 1287 (Fed.Cir.2011) ................................................................. 21, 22

*Wasica Finance GmbH v. Schrader Int'l, Inc.*,
    432 F.Supp.3d 448 (D. Del. Jan. 14, 2020)................................................................ 4

**Statutory Authorities**

35 U.S.C. § 112 ......................................................................................................... 29

35 U.S.C. § 287(a) .................................................................................................... 11

35 U.S.C. § 315(e)(2)................................................................................................1, 3, 4

**Rules and Regulations**

Fed. R. Civ. P. 56(a), (b)............................................................................................. 2

**Additional Authorities**

*Excalibur ARM-Based Embedded Processors PLDs Hardware Reference Manual* (Jan.
    2001).................................................................................................................. 9

*Programmable Logic Device Family Data Sheet* (May 2001 ...................................... 9

U.S. Patent No. 5,197,140............................................................................................. 24, 25

## INTRODUCTION

### I.   STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

On May 30, 2019, Plaintiff Pact XPP Schweiz AG ("PACT") filed a Complaint against Defendant Intel Corporation ("Intel") alleging patent infringement.  D.I. 1.  Intel filed its answer (D.I. 6) and subsequently an amended answer (D.I. 153) on June 4, 2019 and June 12, 2020, respectively.   This motion is filed contemporaneously with the parties' respective *Daubert* motions.  *See* D.I. 259.

PACT moves for partial summary judgment on the issue of IPR estoppel, and Intel's affirmative defenses of marking, covenant not to sue, inequitable conduct, equitable estoppel, and exhaustion for the following reasons:

1.  PACT is entitled to summary judgment on Intel's invalidity grounds regarding the P6, Power4, TMS, NUMA-Q, and Excalibur systems because Intel is estopped from asserting these grounds under 35 U.S.C. § 315(e)(2).

2.  PACT is entitled to summary judgment on Intel's Fourth Affirmative Defense, Marking, with regard to the '301 and '047 patents because the undisputed facts establish that the products Intel accuses do not practice the "adapted for reducing clock frequencies of the data processing elements in response to a determination that a power reserve of a battery is below a predetermined threshold" limitation of claim 8 of the '301 patent, or the "wherein the voltage supply is adapted to supply higher supply voltages for data processing at higher clock frequencies" limitation of claims 1 and 4 of the '047 patent.

3.  PACT is entitled to summary judgment on Intel's Seventh Affirmative Defense, No Infringement Due to Covenant Not To Sue, and Intel's breach of contract counterclaim because there is no dispute that the covenant not to sue at issue covers only "FSB Patent Rights," and

because Intel fails to provide any evidence that the Asserted Patents constitute "FSB Patent Rights."

4. PACT is entitled to summary judgment on Intel's Fifth and Sixth Affirmative Defenses, Exhaustion and Equitable Estoppel, because Intel has failed to present any factual basis that could sustain a finding of exhaustion or equitable estoppel.

5. PACT is entitled to summary judgment on Intel's Ninth Affirmative Defense, Inequitable Conduct, because the undisputed facts show Intel cannot establish that any of the individuals involved in the prosecution of the asserted patents (1) misrepresented or omitted information material to patentability, or (2) did so with the specific intent to deceive the PTO.

## II.    LEGAL STANDARD

Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim or defense. Fed. R. Civ. P. 56(a), (b); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . ") (internal quotation marks omitted).

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id*. at 322–23. However, "to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party"; "[a] party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements." *Pridgen v. Green Valley SNF LLC*, 756 F. Supp. 2d 614, 618 (D. Del. 2010) (citations omitted).

## III.    INTEL'S INVALIDITY GROUNDS SHOULD BE ESTOPPED UNDER § 315(e)(2)

Intel previously pursued (and lost) IPRs challenging the asserted claims of the '631, '908, '301, and '047 patents.  SoF, ¶¶19-22.  Specifically, the PTAB issued final written decisions finding that all of the asserted claims were valid over various prior art patents and publications, including "Arimilli," "Bauman," "Chaney," "Nicol," and "Bhatia."  *Id.*

Unsatisfied with the outcomes of these IPRs, Intel seeks a second bite at the apple by alleging in this litigation that the asserted claims of the '631, '908, '047, and '301 patents are anticipated by and/or obvious over purported prior art systems "P6 System," "Power4," "TMS," "NUMA-Q," and/or "Excalibur."  SoF, ¶¶27-30.  Intel also alleges that one or more of the asserted claims are invalid over these systems in combination with one or more patents that were already raised in the IPRs (Arimilli Bauman, Chaney, Nicol, and Bhatia) and other patents not raised in the IPRs but nevertheless known to Intel at the time it filed its IPRs ("Foster," "Gilbert," "Kling," "Cline," "Watts," and "Michail,") (collectively "prior art patents").  *Id.*, ¶¶17-18, 27-30.

As explained below, Intel should be estopped under 35 U.S.C. § 315(e)(2) from arguing that the P6, Power4, TMS, NUMA-Q, and Excalibur systems invalidate the asserted claims (whether alone or in combination with the prior art patents) because Intel is using these systems to cloak its actual invalidity grounds that are based on publicly available references that disclose all of these systems' relevant features.  Intel had actual knowledge of these publicly available references and prior art patents at the time it filed its IPRs, and, therefore, it reasonably could have raised these invalidity grounds in its IPR petitions.[1]  SoF, ¶¶17-18, 24.

---

[1]  Even if Intel did not have actual knowledge of the P6 Manual Vol. 1 (*see infra*), the P6 Manual Vol. 1 could have been reasonably discovered by a skilled searcher conducting a diligent search given that Intel had actual knowledge of the P6 Manual Vol. 3.  SoF, ¶¶17-18.

A.    **Legal Standards of § 315(e)(2)**

Under 35 U.S.C. § 315(e)(2), "[t]he petitioner in an [IPR] of a claim in a patent…that results in a final written decision…*may not assert* [] in a civil action…that the claim is invalid on *any ground that the petitioner raised or reasonably could have raised during that* [*IPR*]." The Federal Circuit held that "estoppel applies not just to [instituted] claims and grounds asserted in the petition…, but to all grounds not stated in the petition but which reasonably could have been asserted against the claims." *California Institute of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022). And while physical products cannot be raised in an IPR, this district has held that invalidity grounds that include physical products can be estopped when a prior art patent or publication that was reasonably available to the accused infringer for use in an IPR discloses the relevant features of the physical product.[2] A reference is reasonably available for use in an IPR when the accused infringer had actual knowledge of the reference or the reference could have been reasonably discovered by a skilled searcher conducting a diligent search. *Wasica*, 432 F.Supp.3d at 453.

B.    **Intel's Attempts to "Cloak" Printed Publications as System Art Alone or in Combination with Other Known Prior Art Patents Should Be Estopped**

1.    **Texas Instruments TMS320C80 System Is Cumulative to Balmer**

Having lost its IPRs against the asserted claims of the '631, '908, and '047 patents (SoF, ¶¶19-21), Intel now alleges that these claims are invalid over Texas Instruments' TMS320C80. However, as explained below, the TMS system is cumulative of U.S. Patent 5,197,140 ("Balmer").

---

[2]   *Wasica Finance GmbH v. Schrader Int'l, Inc.*, 432 F.Supp.3d 448, 453-54 n.6 (D. Del. Jan. 14, 2020) (finding persuasive the line of reasoning in: *Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*, 2019 WL 861394, at *10 (N.D. Ill. Feb. 22, 2019); *California Institute of Technology v. Broadcom Ltd.*, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019); *Milwaukee Electric Tool Corp. v. Snap-On, Inc.*, 271 F. Supp. 3d 990, 1026-33 (E.D. Wis. 2017); *Clearlamp, LLC v. LKQ Corp.*, 2016 WL 4734389, at *8 (N.D. Ill. Mar. 18, 2016)).

Balmer issued before the asserted claims' priority dates. SoF, ¶¶9-10, 31. That Balmer is directed at the TMS system is indisputable given that Balmer is assigned to Texas Instruments and its specification expressly references the TMS system and even incorporates by reference two TMS *user guides* and two patents that disclose the TMS. Ex. 29 (Balmer), 15:19-26. Balmer was also known to Intel when Intel filed its IPRs against the '631, '908, and '047 patents. SoF, ¶32.

Balmer describes all of the relevant features of the TMS system that Intel's expert (Dr. Lin) alleges renders the asserted claims of the '631, '908, and '047 patents invalid. SoF, ¶¶93-94. In particular, the same figure depicting a block diagram of the TMS, including the TMS's parallel processors (PP), master processor (MP), and crossbar, is shown in both Balmer and a TMS document that Intel's expert relies on. SoF, ¶33. Indeed, this figure is so crucial to Intel's argument that Intel's expert report depicts it *eight* times in the '631 patent analysis alone. Ex. 1 (Lin Rpt.), ¶¶509-564.

Balmer also discloses every alleged feature of the TMS system that Dr. Lin maps to the limitations of the asserted claim of the '908 patent and all but one feature of the asserted claims of the '047 patent. SoF, ¶94. Thus, the TMS system is entirely cumulative to Balmer for all asserted claims of the '631 and '908 patents and also asserted claim 4 of the '047 patent. The only alleged feature of the TMS system that Intel's expert cites to that is not disclosed in Balmer is an "external interrupt." This feature is cited by Dr. Lin for asserted claims 7 and 13 of the '047 patent. *See* Ex. 1 (Lin Rpt.), ¶¶2290-2291, 2301, 2303. However, Intel relies on a publicly available manual for this feature that predates the '047 patent's priority date. *See id.* (citing Ex. 31 (Texas Instruments TMS "Master Processor User's Guide")). Hence, the TMS system is cumulative to the combination of Balmer and the Master Processor (MP) User's Guide for asserted claims 7 and 13.

Intel had actual knowledge of Balmer and the MP User's Guide at the time it filed its IPRs

against the '631, '908, and '047 patents (SoF, ¶¶17-18, 32).  Thus, Intel reasonably could have raised Balmer alone or in combination with the MP User's Guide in its IPRs against the '631, '908, and '047 patents.[3]  Therefore, Intel should be estopped from raising invalidity arguments based on the TMS alone or in combination with Bauman, Chaney, Kling, Cline, Nicol, and Bhatia because these are all grounds that it could have raised in the IPRs against the '631, '908, and '047 patents.

## 2.   IBM's Power4 System Is Cumulative to the Power4 Redbook

Intel also alleges that the asserted claims of the '631 and '908 patents are anticipated and/or obvious over IBM's Power4 system.  SoF, ¶¶27-28.  Intel further contends that the '908 patent's asserted claim is obvious over the combination of Power4 and prior art patent "Foster."  *Id.*

Intel relies almost exclusively on publicly available documents that describe IBM's Power4 system in alleging that the asserted claims are invalid over Power4.  One of these documents, *The Power4 Processor Introduction and Tuning Guide* ("Power4 Redbook"), is a user guide on the Power4 system published by IBM in November 2001, which is before the asserted priority date of the '631 and '908 patents.  SoF, ¶¶9, 17.  Intel's expert relies heavily on the Power4 Redbook, citing to it more than 30 times against the '631 patent alone.  Ex. 1 (Lin Rpt.), ¶¶444-508.

Notably, the Power4 Redbook discloses each and every alleged feature of the Power4 system that Dr. Lin maps to the limitations of asserted claim 4 of the '631 patent.  SoF, ¶95.  The same is true for asserted claim 5 of the '908 patent.  *Compare* Ex. 1 (Lin Rpt.), ¶¶703-763 *with* Ex. 30 (Power4 Redbook), 1-51.  Thus, the Power4 system is cumulative to the Power4 Redbook.[4]

---

[3]  Intel could have reasonably argued that a POSITA would have been motivated to combine Balmer and the TMS MP User's Guide because both references describe the TMS system and Balmer incorporates by reference other TMS user guides. Ex. 29 (Balmer), 15:19-26.

[4]  Power4 is also cumulative to another printed publication that predates the '631 and '908 patents: *Power4 Focuses on Memory Bandwidth* (1999) ("Power4 Report").  SoF, ¶¶17.  Intel recently argued in an *ex parte* reexamination request that the Power4 Report renders obvious every limitation of another bus system patent in this litigation.  SoF, ¶¶18, 25.  Intel reasonably could

Intel had actual knowledge of the Power4 Redbook at the time it filed its IPRs against the '631 and '908 patents.  SoF, ¶¶17-18.  Hence, Intel should be estopped from raising invalidity arguments based on the Power4 system alone or in combination with Foster because these are grounds that it could have raised in the IPRs against the '631 and '908 patents.

### 3.   Intel's P6 System Is Cumulative to Intel's P6 Developer's Manual

Intel alleges that the asserted claims of the '631 and '908 patents are anticipated and/or obvious over Intel's P6 Orion Chipset multiprocessor system ("P6 System").  SoF, ¶¶27-28.  Intel also alleges that one or more of these patents' asserted claims are obvious over the P6 system in view of prior art patents Arimilli, Bauman, Chaney, and/or Foster.  *Id.*  Arimilli, Bauman, and Chaney were already raised (unsuccessfully) in IPRs against these patents.  SoF, ¶¶19-20.

In 1995-1996, Intel published a developer's manual for the P6 System that predates the asserted patents: *Pentium Pro Family Developer's Manual Volume 1: Specifications, Volume 2: Programmer's Reference Manual, and Volume 3: Operating System Writer's Guide* ("P6 Manual Vol. [1/2/3]").  While P6 Manual Vols. 1 and 2 are not referenced in Intel's invalidity contentions, Vol. 3 is.  SoF, ¶¶17-18.  Thus, since Intel knew of Vol. 3 prior to filing its IPRs, it also had actual knowledge (or should have known) of the Vols. 1 and 2 because each volume refers to all three volumes on its cover page.  *See* Exs. 32-33 (P6 Manual Vols. 1-3).

Notably, the P6 Manual Vols. 1-2 disclose all of the relevant features of the P6 System that Intel relies on in its P6 System-based invalidity grounds for the '631 patent.  SoF, ¶96.  Many of the same features of the P6 System found in the P6 Developer's Manual for the '631 patent are also relied on by Intel for the '908 patent, and, thus, the same analysis above equally applies for

---

have raised the Power4 Report in an IPR against the '631 and '908 patents for the same reasons as the Power4 Redbook.  *Compare* Ex. 1 (Lin Rpt.), pgs. 260-315, 447-505 *with* Ex. 40 (Power4 Report).

the '908 patent.  Unique for the '908 patent, however, the P6 Manual Vol. 1 also discloses: the same "I/O bridge" and "clusters" Intel's expert relies on (*compare* Ex. 1 (Lin Rpt.), ¶¶656-659 *with* Ex. 32 (P6 Manual Vol. 1), 1-1 to 1-7); the same self and "rotating agent IDs (*compare* Ex. 1 (Lin Rpt.), ¶¶662-663 *with* Ex. 32 (P6 Manual Vol. 1), 4-1 to 5-20); and the same synchronous latched bus protocol (*compare* Ex. 1 (Lin Rpt.), ¶¶667 *with* Ex. 32 (P6 Manual Vol. 1), 3-2).  Thus, the P6 System is cumulative to the P6 Manual Vols. 1-2 for the asserted claims of both the '631 and '908 patents.

Since Intel knew of (or reasonably could have found) the P6 Manual Vols. 1-2, Intel could have raised the P6 Manual in an IPR against the '631 and '908 patents.  Intel should not be allowed a second bite at the apple and should be estopped from raising invalidity arguments based on the P6 System alone or in combination with Arimilli, Bauman, Chaney, and/or Foster.

### 4.    Sequent's Numa-Q Is Cumulative to Safranek and the P6 Manual

Intel alleges that the asserted claims of the '631 and '908 patents are also invalid over Sequent's Numa-Q system.  SoF, ¶¶27-28.  Intel further alleges that one or more of these patents' asserted claims are obvious over Numa-Q in view of the prior art patents Arimilli, Bauman, Chaney, Foster, and "Gilbert."   *Id.*   Because the Numa-Q system includes Intel's P6 microprocessors (*e.g.*, Pentium Pro processors), Intel's expert's invalidity analysis relies on printed materials that describe both Numa-Q and the P6 System.  *See, e.g.*, Ex. 1 (Lin Rpt.), ¶¶572-615 (citing to P6 analysis).

As explained above, the relevant P6 System features are disclosed in the P6 Manual.  *See supra* Section III.B.3.  For features unique to Numa-Q, Intel's expert relies heavily on a publicly available paper published by Sequent before the '631/'908 patents' priority date: *NUMA-Q: An SCI-based Enterprise Server* (1999) ("Safranek").  *See* Ex. 1 (Lin Rpt.), ¶¶565-617.  Intel's expert's reliance on other materials is inconsequential because Safranek alone discloses each and

8

every feature unique to Numa-Q (beyond the P6 System) that Dr. Lin relies on to allege that Numa-Q invalidates the asserted claims. SoF, ¶97. The same features of Numa-Q identified above that are found in Safranek for the '631 patent equally apply to Dr. Lin's analysis for the '908 patent. *Compare* Ex. 1 (Lin Rpt.), pgs. 506-554 with Ex. 35 (Safranek).

Thus, Numa-Q is cumulative to the combination of Safranek and the P6 Manual Vols. 1-2. Since Safranek was actually known to Intel (SoF, ¶¶17-18), and the P6 Manuals Vols. 1-2 were either actually known or should have been known to Intel (*see supra*), Intel reasonably could have raised the combination of Safranek and the P6 Manual Vols. 1-2 in IPRs against the '631 and '908 patents. For this reason, Intel should be estopped from relying on invalidity grounds based on Numa-Q alone or in combination with Arimilli, Bauman, Chaney, Foster, and Gilbert.

**5.     Altera's Excalibur Is Cumulative to Excaliber/APEX Publications**

Intel previously pursued (and lost) an IPR challenging asserted claims 8, 14, and 16-17 of the '301 patent. SoF, ¶22. Seeking a second bite at the apple, Intel now alleges in this litigation that these asserted claims are anticipated and/or obvious over Altera's Excalibur system. SoF, ¶30. Intel also alleges that the asserted claims are obvious over Excalibur in view of prior art patents Nicol (already raised in the IPR), "Watts," "Michail," and "Cline," which were all known to Intel at the time it filed its IPR. *Id.*, ¶¶17-18, 30. These Excalibur-based invalidity grounds all rely on a number of publicly available publications that predate the '301 patent's asserted March 5, 2002 priority date, including *Excalibur ARM-Based Embedded Processors PLDs Hardware Reference Manual* (Jan. 2001) ("Excalibur HW Manual"), *APEX 20K Programmable Logic Device Family Data Sheet* (May 2001, ver. 3.7) ("APEX Datasheet"), *ARM922T (Rev 0) Technical Reference Manual* (Sept. 2000) ("ARM Manual"), and *Using the ClockLock & ClockBoost Features in APEX Devices Application Note 115* (May 1999, ver. 1.0) ("ClockLock Note").

Notably, combinations of these publications disclose each and every feature of the

Excalibur system that Intel relies on in its invalidity analysis for the '301 patent's asserted claims. SoF, ¶98. Thus, the Excalibur System is cumulative to the combination of the Excalibur HW Manual, APEX Datasheet, and ARM Manual for asserted claims 8 and 17, and the combination of these three references plus the ClockLock Note for asserted claims 14 and 16.

Since Intel had actual knowledge of these four printed publications (SoF, ¶¶17-18) at the time it filed its IPR, Intel reasonably could have raised these publications in the '301 patent IPR. And because these printed publications expressly relate to the Excalibur or the ARM processor included in the Excalibur, Intel could have argued that a POSITA would have been motivated to combine teachings from these references. Hence, Intel should be estopped from raising invalidity arguments based on the Excalibur system alone or in combination with Watts, Michail, Cline, and Nicol.

## IV.   INTEL HAS NOT OFFERED EVIDENCE DISPUTING THAT THE LICENSEE PRODUCTS DO NOT PRACTICE THE '301 OR '047 PATENT

Claim 8 of the '301 patent and claims 1 and 4 of the '047 patent have limitations requiring the systems be "adapted for" or "adapted to" performing certain functionality. SOF, ¶ 39(a)-(b). In Dr. Conte's opening and rebuttal reports, PACT has offered expert opinion and analysis explaining that the Licensee Products do not practice any claims of the '301 or '047 patent, including because they do not practice the "adapted for" or "adapted to" claim limitations. SOF, ¶¶ 45-48, 50-55. By contrast, in the opening report of Dr. Mowry, Intel's expert, Dr. Mowry only opined that it would be obvious to a POSITA that the Licensee Products *could be* adapted to practice the "adapted for" and "adapted to" claim limitations. SOF, ¶¶ 40-43. But the phrase "adapted to" "generally means 'made to,' 'designed to,' or 'configured to.'" *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) (citing *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014)). Thus, Dr. Mowry has not offered any opinion that the Licensee Products

are in fact "adapted for" or "adapted to" practice the limitations of claim 8 of the '301 patent and claims 1 and 4 of the '047 patent. Because Dr. Mowry only alleges that the Licensee Products practice claim 8 of the '301 patent and claims 1 and 4 of the '047 patent (SOF, ¶¶ 38, 57), Intel has failed to come forward with any evidence rebutting Dr. Conte's opinions that the Licensee Products do not practice the claims of the 301 and '047 patent.[5]

## A.    <u>Legal Standard</u>

### 1.    <u>Patent Marking</u>

"Pursuant to 35 U.S.C. § 287(a), a patentee [or their licensee] who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). "If a patentee . . . has not 'given notice of his right' by marking his articles pursuant to the marking statute, he is not entitled to damages before the date of actual notice." *Id.* at 1366. However, "The recovery of damages is not limited where there is no failure to mark, . . or where there are no products to mark." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002).

### 2.    <u>Meaning of "adapted to" or "adapted for" Claim Terms</u>

Intel's Dr. Mowry reads the "adapted to" and "adapted for" claim limitations as only requiring a system that a POSITA could configure to practice the limitation of a patent claim. *See, e.g.*, Mowry Opening Rpt., ¶¶ 180 ("it would have been obvious to a POSITA that the Zynq-7000 *can be adapted for*" practicing the '301 patent claim limitation).[6] But the claim language and

---

[5]  Dr. Mowry did offer opinions with regard to claim 16 (depending on 15) of the '301 patent and claims 7 and 13 of the '047 patent in his rebuttal report. Mowry Rebuttal Rpt. Vol. 5, ¶¶ 203, 218, 238-243, 250-255. But these claims are all dependent on the claims Dr. Mowry originally opined on in his opening report. *See* '301 patent, claim 15; '047 patent, claims 7, 13. Therefore, for the reasons discussed herein that PACT is entitled to summary judgment with respect to claim 8 of the '301 patent and claims 1 and 4 of the '047 patent, PACT is entitled to summary judgment with respect to these claims.

[6]  All emphasis added herein unless otherwise indicated.

specifications of the '301 and '047 patents make clear that the claim terms should be given the narrower meaning of "made to" or "configured to," not merely "capable of." *In re Gianelli*, 739 F.3d at 1379. The phrase "adapted to" "generally means 'made to,' 'designed to,' or 'configured to.'" *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) (citing *.In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014)). The phrase "adapted to" and "adapted for" have a narrow meaning where the claim language and written description make clear that the system or apparatus is "designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *see also In re Man Mach, supra* 822 F3d at 1286

**First**, in *Aspex Eyewear*, the Federal Circuit held that the most natural reading of claim language specifying a structure "adapted to" perform a specified function is that such structure is "designed or configured to accomplish the specified objective, not simply that the structure can be made to serve that purpose." *Id.* at 1349. Similarly, the '301 and '047 claims recite structures "adapted to" or "adapted for" performing a specified function. *See* '301 patent, claim 8 (reciting a "processor device" "adapted for" the specified function of "reducing clock frequencies of the data processing elements in response to a determination that a power reserve of a battery is below a predetermined threshold"); '047 patent, claim 1 (reciting a "voltage supply" "adapted to" the specified function of "supply[ing] higher supply voltages for data processing at higher clock frequencies"). Thus, like the claim language in *Aspex*, the limitations of claim 8 of the '301 patent and claim 1 of the '047 patent are most naturally read as claiming something more narrow than structures that "can be made to serve" the claimed purpose.

**Second**, "the written description" of the '301 and '047 patents "makes clear that 'adapted to'" and "adapted for" "ha[ve] a narrower meaning" than merely "'capable of' or 'suitable for.'"

*In re Giannelli*, 739 F.3d at 1379.  Claim 8 of the '301 patent recites "the processor device is adapted for reducing clock frequencies of the data processing elements in response to a determination that a power reserve of a battery is below a predetermined threshold."  The '301 patent specification describes a processor device that *is* adapted such that clock frequencies are reduced in response to the power reserve of a battery, not merely a processor device that ***can be*** adapted for practicing the limitation.  *See* '301 patent, 7:49-53 ("Depending on the power reserve . . . the frequency of PAEs and/or groups of PAEs *is* determined and *is* reduced in particular when the power reserve is low").  Therefore, claim 8 of the '301 patent should be properly read as claiming a "processor device" that is "designed or configured to" reduce clock frequencies in response to the power reserve of a battery, and not merely a processor device that "can be made to serve that purpose."  *Aspex Eyewear*, 672 F.3d at 1349; *In re Giannelli*, 739 F.3d at 1380.

Similarly, claim 1 of the '047 patent recites "wherein the voltage supply is adapted to supply higher supply voltages for data processing at higher clock frequencies."  The '047 specification describes a voltage supply that *is* adapted to provide higher supply voltages at higher clock frequencies, not merely a voltage supply that ***can be*** adapted to practice the limitation.  *See* '047 patent, 11:19-20 ("An optimum compromise may be achieved in that the voltage supply *is made* dependent on the clock frequency), 11:22-24 ("With increasing clock frequencies, the supply voltage *is* also increased").

### B.    The Licensee Products Are Not "adapted to" or "adapted for" Practicing the '301 or '047 Patent Claim Limitations

#### 1.    The '301 Patent

In Dr. Conte's opening and rebuttal reports, he provided analysis explaining that the Licensee Products are not "adapted for reducing clock frequencies of the data processing elements

in response to a determination that a power reserve of a battery is below a predetermined threshold." SOF, ¶¶ 45-46, 51-53.

In Dr. Mowry's opening, rebuttal, and reply reports, Dr. Mowry does not contend that the Licensee Products *are in fact* "adapted for" practicing the claim limitation, but instead opines that it would have been obvious to a POSITA that the products *could be* adapted for practicing the limitation. Mowry Opening Rpt., ¶¶ 180 (opining only that "it would have been obvious to a POSITA that the Zynq-700 *can be* adapted for" practicing the limitation); SOF, ¶¶ 40, 59-60. Therefore, Dr. Mowry does not contend the Licensee Products "[are] adapted for reducing clock frequencies of the data processing elements in response to a determination that a power reserve of a battery is below a predetermined threshold," and Intel has failed to come forward with any evidence rebutting Dr. Conte's opinions that the Licensee Products do not practice the claims of the '301 patent.

## 2.   The '047 Patent

In Dr. Conte's opening and rebuttal reports, he provided analysis explaining that the Licensee Products do not include any "voltage supply [] adapted to supply higher supply voltages for data processing at higher clock frequencies." SOF, ¶¶ 47-48, 50.

In Dr. Mowry's opening, rebuttal, and reply reports, Dr. Mowry does not contend that the Licensee Products' voltage supplies are "adapted to" practice the claim limitation. For the Zynq-7000 products, Dr. Mowry opines that the products contain voltage supplies and contain voltage controlled oscillators ("VCOs") that *could* change frequencies in response to the voltage supplies. Ex. 2 (Mowry Opening Rpt.), ¶¶ 210-213. But Dr. Mowry fails to offer any evidence that the identified voltage supplies "[are] adapted to supply higher voltages" to adjust the VCO output frequency. Ex. 2 (Mowry Opening Rpt.), ¶¶ 210-213 (identifying the "Power pins" as the products' voltage supplies, and the separate "phase frequency detectors" as the structure that

provides variable voltage to the VCOs).  Dr. Conte explains in his rebuttal report that the Zynq-7000 products' phase frequency detectors and charge pumps—not their voltage supplies—are adapted to provide variable voltages to the VCOs.  Ex. 5 (Conte Rebuttal Rpt.), ¶ 189.  In reply, Dr. Mowry does not provide any evidence or opinion rebutting Dr. Conte.  Ex. 6 (Mowry Reply Rpt.), ¶ 105 (repeating the opinion from his opening report).

For the Zynq Ultrascale+ products, Dr. Mowry opines that the products could be adapted to make clock frequency adjustments and can monitor voltages and frequencies, but fails to provide any evidence or opinion that the products' voltage supplies "[are] adapted to supply higher voltages for data processing at higher clock frequencies."  Ex. 2 (Mowry Opening Rpt.), ¶ 221.  Dr. Mowry provides no rebuttal to Dr. Conte's opinions regarding this claim limitation, and does not offer any further evidence or opinion regarding this limitation in his reply report.  Ex. 4 (Mowry Rebuttal Rpt.), 105 (providing a heading for the claim limitation, but no opinions); Ex. 6 (Mowry Reply Rpt.), ¶ 110 (offering no opinion or evidence that any of the products' voltage supplies "[are] adapted to" to practice the limitation).

For the Microsemi SmartFusion 2 products, Dr. Mowry opines that "a POSITA would have found it obvious to supply higher supply voltages for data processing at higher clock frequencies," but fails to offer any evidence or opinion that the Microsemi SmartFusion 2 products "[are] adapted" to practice the limitation.  Ex. 2 (Mowry Opening Rpt.), ¶ 232; Ex. 6 (Mowry Reply Rpt.), ¶ 118-119 (opining the SmartFusion 2 SoC could be connected to a voltage supply adapted to practice the claim limitation, but failing to offer any evidence the SmartFusion 2 SoC's voltage supplies "[are] adapted to" practice the claim limitation).

Thus, Dr. Mowry does not contend the Licensee Products practice the "wherein the voltage supply is adapted to supply higher supply voltages for data processing at higher clock frequencies"

claim limitation, and Intel has failed to come forward with any evidence rebutting Dr. Conte's

opinions that the Licensee Products do not practice the claims of the '047 patent.

### C.     PACT Is Entitled to Summary Judgment That There Has Been No Failure to Mark With Respect to the '301 and '047 Patents

Because the undisputed facts establish that the Licensee Products do not practice the

"adapted for" limitation of claim 8 of the '301 patent, or the "adapted to" limitation of claims 1

and 4 of the '047 patent, PACT is entitled to summary judgment that PACT's licensees were not

required to mark the Licensee Products. *See Texas Digital*, 308 F.3d at 1220.

## V.   INTEL'S 7TH AFFIRMATIVE DEFENSE ("NO INFRINGEMENT DUE TO COVENANT NOT TO SUE) AND COUNTERCLAIM I ("BREACH OF CONTRACT")

In the Amended Answer filed September 10, 2020, Intel raises an affirmative defense that

the PACT cannot assert the Patents-In-Suit against Intel pursuant to a October 15, 2007 letter

agreement ("Covenant Not To Sue" or "Covenant") between PACT XPP Technologies Inc.

("PACT Tech") and Intel.[7]   D.I. 153, ¶ 13 (Seventh Affirmative Defense).   Intel also asserts that

PACT is in breach of the Covenant Not To Sue by asserting the Patents-in-Suit against Intel.   There

is no dispute that the Covenant Not To Sue covers only "FSB Patent Rights," and because Intel

fails to provide any evidence that the Asserted Patents constitute "FSB Patent Rights," the Court

should grant PACT summary judgment and reject Intel's affirmative defense and counterclaim at

issue.

On October 15, 2007, PACT Tech entered into a Covenant Not To Sue with Intel during a

joint venture negotiation right before Intel provided certain confidential information to PACT

Tech.   *See* Ex. 10 (Covenant Not To Sue).   Such confidential information is defined in the

---

[7]   For the purposes of argument of this summary judgment motion, PACT does not dispute that the Covenant Not To Sue binds PACT.

Covenant Not To Sue as "FSB Enabling Information." The "FSB Enabling Information" further sets the scope for the "FSB Patent Rights": "'FSB Patent Rights' means [PACT's] Patent Rights that . . . but for this Agreement, would be infringed by . . . Intel's Products due in whole or in part to those products' inclusion or implementation of any portion of the FSB Enabling Information." Ex. 10 (Covenant Not To Sue) at 1. In other words, the scope of the "FSB Patent Rights" is defined based on the "FSB Enabling Information." If the a patent covers an Intel's product *because of its inclusion* of the "FSB Enabling Information," such patent would be "FSB Patent Rights." However, Intel has not provided any evidence to establish that the accused products infringe because of their inclusion of the "FSB Enabling Information.

During the discovery, PACT, through a contention interrogatory, requested the "full basis" of Intel's affirmative defense and counterclaim based on the Covenant Not To Sue:

> State the full basis (including identification of all relevant facts, Documents evidence, and persons with knowledge) for [Intel's] Seventh Affirmative Defense ("No Infringement Due to Covenant Not to Sue") and "breach of contract" counterclaim (Count I).

Ex. 28 at 7 (PACT's Interrogatory No. 5). In the response, Intel acknowledges that "[u]nder the Covenant Not To Sue, PACT agreed not to assert any 'FSB Patent Rights.'" Ex. 28 at 8 (Intel's First Response to PACT's Interrogatory No. 5). Thus, there is not genuine dispute of the Covenant's scope—the Covenant is limited to "FSB Patent Rights." Thus, to prove its affirmative defense and counterclaim, Intel must prove that the Asserted Patents constitute "FSB Patent Rights." As discussed above, in order to establish the "FSB Patent Rights," Intel must also prove that the Asserted Patents cover "FSB Enabling Information." However, Intel fails to do so.

Intel's first response to PACT's contention Interrogatory merely acknowledges the existence of the Covenant and its scope. *See, e.g.,* Ex. 28 at 8 (Intel's First Response to PACT's Interrogatory No. 5) ("Intel and PACT's predecessor, PACT XPP Technologies Inc. entered into

a letter agreement in 2007 that contained a covenant not to sue. . . . Under the Covenant Not To Sue, PACT agreed not to assert any 'FSB Patent Rights.'").  Its second response makes general reference to certain deposition transcripts, without identifying any specific testimony.  Ex. 28 at 9 (Intel's Second Response to PACT's Interrogatory No. 5) ("Additional support for Intel's position can be found in the depositions of David Clark, Steven Pawlowski, Arthur Sheiman, Martin Vorbach, Goetz Gleichman and the exhibits to those depositions.").

These conclusory statements fail to identify any specific "FSB Enabling Information," much less any infringement of the Asserted Patents "due [] to [the] inclusion" of such information, without which Intel cannot establish that the Asserted Patents constitute "FSB Patent Rights" covered by the Covenant.  In addition, Intel fails to provide any expert testimony as to how the infringement theories relate to the "FSB Enabling Information."  Thus, Intel's conclusory assertions cannot prove that PACT's patent enforcement violates any contractual obligation under the Covenant that is limited to "FSB Patent Rights."  *Hollingsworth v. R. Home Property Management, LLC*, 498 F.Supp.3d 590, 600 (E.D. Pa., 2020) ("a party opposing summary judgment 'must present ***more than just "bare assertions, conclusory allegations*** or suspicions" to show the existence of a genuine issue.'") (citing *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)) (emphasis added).

## VI.   THE COURT SHOULD DISMISS INTEL'S FIFTH AND SIXTH AFFIRMATIVE DEFENSES (EXHAUSTION AND EQUITABLE ESTOPPEL)

The Court should also dismiss Intel's fifth affirmative defense (exhaustion).  Intel's Answer provides a single conclusory sentence allege that "some or all of PACT's claims are barred by the doctrine of patent exhaustion."  But Intel has failed to present any factual basis that could sustain a finding of exhaustion and summary judgment is therefore appropriate.

The Court should grant summary judgment on Intel's "Sixth Affirmative Defense (Equitable Estoppel)." Dkt. No. 153 (Answer), 46-47.  In particular, Intel's Answer alleges that "PACT's claims of infringement are barred by one or more of the doctrine of equitable estoppel, wavier, acquiescence, and/or unenforceability."  But Intel fails to plead facts that could support such a finding.  Three elements are required for equitable estoppel to bar a patentee's suit: (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.  Intel cannot establish any of these elements.

The Federal Circuit has made clear that equitable estoppel does not apply to pre-issuance conduct.  *John Bean Technologies Corporation v. Morris & Associates, Inc.*, 887 F.3d 1322, 1327-29 (Fed. Cir. 2018) (we have held "equitable estoppel could not apply to pending patent claims even if those claims when issued could claim priority to a parent patent subject to equitable estoppel.").  "The reasoning behind this rule is that claims that have not issued cannot be asserted; and therefore no mispleading conduct or silence could be present."  *Id.*  "In other words, for claims that have not issued, there is no case or controversy and therefore the elements of equitable estoppel are not present.'"  *Id.*[8]  Here, all of the activities that Intel relies upon to allege equitable estoppel took place in 2011 or earlier.  Dkt. No. 153 (Answer), 46-47.  Yet, all of the patents-in-

---

[8]  *See also Radio Systems Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013) (reversing a summary judgment that patentee's conduct supporting equitable estoppel for a first patent applied to a second patent, which was a continuation in part of the first patent, because the second patent had not issued until years after the patentee's conduct); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992) (ruling that no equitable estoppel could apply since the patentee had no contact with the accused infringer after the patents issued, but only had contact before the patent issued); *Neville v. Foundation Constructors, Inc.*, 2019 WL 6894522, *6 (C.D. Cal. 2019) (same); *Ricoh Co. v. Nashua Corp.*, 185 F.3d 884 (Fed. Cir. Feb. 18, 1999) (patentee's silence as to whether accused product infringed when the patent was only pending did not create equitable estoppel).

suit issued after 2011. SoF, ¶¶3-7. Because Intel relies solely on preissuance conduct, no misleading conduct or silence can be present for the patents-in-suit.

Even putting aside Intel's reliance on preissuance conduct, Intel cannot meet the requirement of showing equitable estoppel. For example, Intel relies upon conduct that predates the release of the first accused product (Sandy Bridge) in 2011, and does not present any evidence demonstrating that PACT was aware of these products at the relevant times. This provides a further reason that Intel cannot show misleading conduct or silence. Intel has also failed to provide any evidence that it relied on any PACT conduct with respect to the accused features and products, or that it would be materially prejudiced by allowing PACT to proceed with its claims. There are no triable issues of fact that preclude summary judgment.

## VII. THE COURT SHOULD DISMISS INTEL'S NINTH AFFIRMATIVE DEFENSE OF INEQUITABLE CONDUCT

Intel has alleged inequitable conduct against each Asserted Patent based on four distinct theories: (1) alleged burying by inventor Mr. Vorbach and patent attorneys Mr. Grunberger and Mr. Heller of documents describing the Texas Instruments TMS320C80 processor (the "TI references") during prosecution of the '593, '631, '908, and '047 patents; (2) alleged false declarations by Mr. Vorbach stating that he invented the subject matter claimed in the Asserted Patents; (3) the knowing filing of Mr. Vorbach's alleged false declarations by Mr. Heller and Mr. Grunberger; and (4) Mr. Vorbach's withholding of emails authored by him and Rambus allegedly expressing lack of inventorship and lack of written description support for the asserted claims.

As an initial matter, the latter two theories were not alleged in Intel's Amended Answer or disclosed in its discovery responses and thus have not been preserved. *See Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, No. CIV A 08-464, 2010 WL 3907490, at *1 (D. Del. Sept. 21, 2010). Regardless, these theories fail on the merits. Regarding theory no. 3, Mr. Heller and

Mr. Grunberger reasonably relied on PACT's Germany patent attorney, Peter Pietruk, to identify the named inventors of each PACT patent application. Intel had numerous opportunities to depose Mr. Pietruk but chose not to, so it is in no position to show that PACT intended to deceive the PTO regarding inventorship. Regarding theory no. 4, the emails-at-issue were not material in view of (i) contemporaneous emails where Mr. Vorbach expressed his belief that PACT's technology and patent portfolio covered sequential processors and (ii) the 2010 Letter of Intent ("LOI") between Rambus and PACT regarding the purchase of PACT's patent portfolio by Rambus. For Intel's two other alleged grounds of inequitable conduct, regarding Mr. Vorbach's alleged filing of false declarations, it is undisputed that Mr. Vorbach relied upon Mr. Pietruk to advise him which individuals should be a named inventor on a patent application, and thus did not have a specific intent to deceive. Further, regarding the alleged burying of the TI references, Intel cannot prove that these references were but-for material to patentability, as they are cumulative to a reference cited in an IPR petition for the '593 patent.

### A.    Legal Standard for Inequitable Conduct

To prevail on a claim of inequitable conduct, the accused infringer must prove by clear and convincing evidence that the patentee: (1) misrepresented or omitted information material to patentability and (2) did so "with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed.Cir.2011). "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. To meet the clear and convincing standard, "specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (citation omitted). "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the

circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91 (citation omitted) (emphasis in original).

**B.    Intel Cannot Establish That Messrs. Vorbach, Heller, and Grunberger Committed Inequitable Conduct By "Burying" the TI References**

Intel's "burying" theory fails because Intel has not provided any evidence that demonstrates "the single most reasonable inference that may be drawn from the facts" is that Mr. Vorbach or Mr. Grunburger specifically intended to deceive the patent office. All of the evidence confirms that Mr. Grunberg (and not Mr. Vorbach) was responsible for selecting what to disclose, and that out of an abundance of caution, he submitted all materials disclosed in prior litigation involving related patents. The evidence in the record cannot meet the high bar required for inequitable conduct. In addition, Intel cannot establish that the Texas Instruments TMS320C80 processor (the "TI references") is material to the patentability of the patents at issue because PTAB rejected the invalidity theories based on a cumulative reference during IPR proceedings.

Intel alleges that Messrs. Vorbach, Heller, and Grunberger ("VHG") committed inequitable conduct by "burying" documents describing the Texas Instruments TMS320C80 processor (the "TI references") during the prosecution of the '593, '908, '631, and '047 patents. *See* SoF ¶¶ 75-79. The Federal Circuit has held that "[a]n applicant can not be guilty of inequitable conduct if the reference was cited to an examiner[.]"[9] Thus, even if VHG knew of the TI references and believed that they were material to patentability during the prosecution of these four patents—

---

[9]    *Fiskars, Inc. v. Hung Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000); *see also Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it can not be deemed to have been withheld from the examiner."), *overruled on other grounds by Abbot Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009).

as a matter of law, they cannot have committed inequitable conduct for citing but not highlighting those references to the examiner.[10]

Courts have held that *Fiskars* bars an inequitable conduct claim based on a "burying" theory. In *Symbol Techs, Inc. v. Aruba Networks, Inc.*, the Court struck a "burying" inequitable conduct defense, finding that it was "insufficient as a matter of law" because "based on clear Federal Circuit precedent, 'burying' a relevant reference in a long list of citations cannot support a claim of inequitable conduct." 609 F. Supp. 2d 353, 358-59 (D. Del. 2009). Similarly, in *Signify North America Corp. v. Reggiani Lighting USA, Inc.*, the Court dismissed an inequitable conduct counterclaim, relying on *Fiskars* to conclude that "disclosed publications ... cannot be the basis of an inequitable conduct claim." No. 18 Civ. 11098 (ER), 2020 WL 1331919, at *5 (S.D.N.Y. 2020).[11]

### 1.     Intel Cannot Establish That The TMS320C80 References Were Material to Patentability

Even if "burying" alone is a valid basis for finding inequitable conduct had occurred—it is not—Intel cannot establish that the TI references were material to the patentability of the '593, '908, '631, and '047 patents. "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291. "[I]n assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it

---

[10]   *See Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed. Cir. 2001) ("An inventor's opinions regarding a prior art device known to the examiner are not within the domain of material that must be submitted to the PTO.").

[11]   *See also Seaboard Int'l, Inc. v. Cameron Int'l. Corp.*, No. 1:13-CV-00281-MLH-SKO, 2013 WL 3936889, at *6 (E.D. Cal. 2013) (striking inequitable conduct defense asserting burying of material references "in the hundreds of thousands of pages of patents and litigation papers that were submitted to the PTO").

had been aware of the undisclosed reference." *Id.* Prior art that is cumulative of other references considered by the PTO in IPR proceedings are not but-for material.[12]

The TI references are not but-for material to the patentability the '593 patent because the TMS320C80 system described by these references is cumulative to another reference considered by the PTAB as part of an IPR petition filed by Intel. Intel petitioned for *inter partes* review of the '593 patent, and one of the references cited was U.S. Patent No. 5,197,140 ("Balmer"). SoF ¶ 23. The PTAB considered the Balmer reference and denied institution. *Id.* As discussed above, the TMS320C80 system described by the TI references is cumulative to the Balmer reference. Thus, it is highly likely that the PTO would have allowed the '593 patent claims even if VHG had highlighted the TMS320C80 references to the examiner during prosecution. Accordingly, Intel cannot establish that these references are but-for material to the patentability of the '593 patent.

The TMS320C80 references are also not but-for material to the patentability of the '908, '631, and '047 patents. Intel knew of the Balmer reference's existence when it filed the petitions for *inter partes* review of these patents because those petitions were filed at or around the same time as the '593 patent IPR petition. The fact that Intel cited the Balmer reference in the '593 patent IPR petition but not in the other IPR petitions shows that even Intel did not believe that the Balmer reference would invalidate these patents, and thus supports an inference that the Balmer reference is not but-for material to the patentability of the '908, '631, and '047 patents.[13]

---

[12] *See California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022) (affirming summary judgment of no inequitable conduct where district court had determined that the withheld reference "was merely cumulative of . . . references the PTAB considered in IPR proceedings upholding the patents' validity").

[13] To the extent that Intel relies on the opinions of its expert Prof. Hricik to argue that the TI references were but-for material, as explained in the concurrently filed *Daubert* Motion to Exclude the Expert Opinions of David Hricik, such opinions must be excluded.

## 2. Intel Cannot Establish That The Citation of the TI References in an IDS Was Specifically Intended to Deceive the PTO

Intel cannot establish that VHG—by citing the TI references to the examiner—had a specific intent to deceive the PTO. To meet the clear and convincing standard, "specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (citation omitted). "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91 (citation omitted) (emphasis in original).

The evidence in this case, at a minimum, allows for a reasonable inference that VHG lacked the intent to deceive the PTO because they were trying to err on the side of disclosure when they disclosed the TI references within Information Disclosure Statements ("IDSs") along with numerous other references from pending litigation. The MPEP instructs patent practitioners that relevant information arising out of litigation relating to the subject matter of a patent application must be brought to the examiner's attention. SoF ¶ 88. Furthermore, the MPEP suggests that "[w]hen in doubt, it is desirable and safest to submit information. Even though the attorney, agent, or applicant doesn't consider it necessarily material, someone else may see it differently and embarrassing questions can be avoided." *Id.* ¶ 89. Both Intel and PACT's experts corroborated this suggestion in their deposition testimony by noting that it was common for patent practitioners to err on the side of caution to submit more information rather than less. *See id.* ¶¶ 90-91. This comports with Mr. Grunberger's testimony that he viewed PACT's patent applications as having related subject matter, and thus would submit the prior art identified for each application or issued patent—including prior art cited any litigation involving a PACT patent—in Information Disclosure Statements (IDSs) for each application. *See id.* ¶ 92. Thus, a reasonable inference exists

that even though Messrs. Grunberger and Heller cited the TI references in long IDSs submitted to

the PTO, they did not do so with the specific intent to deceive the PTO.[14,15]

### C.   Intel Cannot Establish That Mr. Vorbach Committed Inequitable Conduct By Knowingly Filing False Inventorship Declarations

Intel alleges that Mr. Vorbach committed inequitable conduct by filing a declaration falsely

claiming to be an inventor of the asserted claims but relies on quotes out of context from emails

from 2009, before any of the patents in suit were filed.  Intel fails to consider that the very evidence

it relies on shows that Mr. Vorbach believed at the time that he did invent, and had even disclosed,

processor based inventions in the relevant applications.

Intel cannot establish that Mr. Vorbach knowingly submitted inventor declarations

containing false statements.  "A holding of unenforceability based on the filing of a false oath

requires that the oath was false, and made with knowledge of the falsity." *Hebert v. Lisle Corp.*,

99 F.3d 1109, 1116 (Fed. Cir. 1996). "Knowledge of falsity is predicate to intent to deceive." *Id.*

As an initial matter, Intel has not established that the inventorship declaration was false.

Intel never deposed any of the other inventors and presented any evidence that Martin Vorbach

was not the inventor of the patents in suit.  Furthermore, it is undisputed that Mr. Vorbach relied

on his German patent counsel to make determinations on inventorship, and because of this had no

intent to deceive the US PTO when he submitted his inventor declaration.

---

[14]   *See Esco Corp. v. Cashman Equip. Co.*, 158 F. Supp. 3d 1051, 1062-63 (D. Nev. 2016) ("The Court also finds that Defendants' allegations of 'burying' do not support an inference of deceptive intent. . . . There are no facts alleged that negate an equally reasonable inference: that ESCO was attempting to avoid being accused of inequitable conduct for failing to disclose enough references."); *ParkerVision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1318 (M.D. Fla. 2013) ("Because specific intent to deceive is not the only or single most reasonable inference to be drawn from the disclosure of voluminous references to the PTO, Qualcomm's pleading of the 'burying' theory fails as a matter of law.").

[15]   To the extent that Intel relies on the opinions of its expert Prof. Hricik to argue that VHG had the specific intent to deceive the PTO, as explained in the concurrently filed *Daubert* Motion to Exclude the Expert Opinions of David Hricik, such opinions must be excluded.

Intel points to quotes from two early 2009 emails that PACT's "patents were … not written for" sequential processors, that PACT "ha[d] currently no claims suitable for stand alone sequential processors," and that he "may" be able to draft claims to cover sequential processors as proof that he knew that his declarations to being an inventor of general purpose processor claims were false, and thus had an intent to deceive the PTO. SoF ¶ 107.

But Intel's selective quotes do not consider the context and the other evidence in this case suggests otherwise. First, the emails are from 2009, before any of the patents in suit were filed. Next, in the very same emails, Mr. Vorbach declared that PACT's technology included "fundamental developments in the area of parallel data processing" and that its patent portfolio included both "an FPGA part, and a processor part." *Id.* ¶ 107. He testified that the patents not written for sequential processors were old patents (PACT01-08), but that the newer patent applications (PACT09 and up) had support in the specifications for sequential processor claims. *Id.* ¶ 109. Mr. Vorbach explained that when he wrote "the patents were also not written for this," he was using the term "patents" to refer to already issued patents from the older families, and not the later patent applications covering PACT's XPP-III processor technology for multi-core processors. *Id.* ¶ 110. Further, he testified that when he wrote that he "may" be able to draft claims covering sequential processors, he was confident that the specifications could support such claims and was just making it seem like it would take more effort as part of negotiations with PACT's Board, who had just taken away all his shares in PACT. *See id.* ¶ 111. This evidence gives rise to an inference that when he submitted the inventorship declarations for the Asserted Patents, Mr. Vorbach genuinely believed that he was an inventor of the presented claims, and that those claims

covered general purpose processors, and Intel cannot show that the single, best inference is that

Mr. Vorbach intended to deceive the US PTO.[16,17]

### D. Intel Cannot Establish That Messrs. Heller and Grunberger Committed Inequitable Conduct By Knowingly Filing False Inventorship Declarations[18]

Intel alleges that Messrs. Heller and Grunberger committed inequitable conduct by filing

"false" declarations claiming that Mr. Vorbach and others were inventors of presented claims.

See SoF ¶¶ 80-87.   According to Intel, these individuals knew that the claims were not

supported by the written description and that Mr. Vorbach did not invent general purpose

processors.   Id.   Intel's argument fails as a matter of law.

Intel does identify any specific mispresented fact or material omission the written

description made or withheld to allow the claims to issue.   At most, Intel presents a validity

---

[16]   *See Everlight Elecs. Co. v. Nichia Corp.*, 143 F. Supp. 3d 644, 657-60 (E.D. Mich. Oct. 20, 2015) (finding that defendant did not satisfy the materiality requirement for argument that named inventors filed a false oath because "the facts established at trial did not show that the inventors submitted a false oath to the USPTO").

[17]   To the extent that Intel relies on the opinions of its expert Prof. Hricik to argue that Mr. Vorbach knew that his declarations were false or question Mr. Vorbach's credibility, as explained in the concurrently filed *Daubert* Motion to Exclude the Expert Opinions of David Hricik, such opinions must be excluded.

[18]   Via the opening and reply expert reports of Professor David Hricik regarding prosecution and enforceability, Intel sets forth contentions regarding alleged inequitable conduct that it had not previously pleaded or disclosed during fact discovery in this case. These contentions assert, *inter alia*, that (i) Messrs. Heller and Grunberger breached the duty of candor and good faith by submitting Mr. Vorbach's declarations attesting to inventorship of claimed inventions that Mr. Vorbach knew neither he nor other named inventors had invented or that Mr. Vorbach knew had been invented by others and (ii) Mr. Vorbach breached the duty of candor and good faith by failing to submit his and Rambus's written opinions regarding lack of inventorship and lack of support for the asserted claims.  Such contentions are improper because they were not pleaded in Intel's Amended Answer or disclosed during fact discovery, and only disclosed for the first time in Professor Hricik's expert reports. As such they should be struck and Intel should be precluded from introducing evidence of these contentions at trial. *See Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, No. CIV A 08-464, 2010 WL 3907490, at *1 (D. Del. Sept. 21, 2010) ("Having reviewed each of the alleged new contentions and the defendants' pleadings, interrogatory responses, and expert reports, the court will limit defendants to introducing evidence of contentions adequately disclosed in their pleadings or through discovery.").

challenge under 35 U.S.C. § 112.  The Examiner in this case was in full possession of the written description and concluded that the written description supported the full scope of the claims.

Moreover, Intel cannot show that Messrs. Heller and Grunberger intentionally misled the patent Examiner with false or misleading statements.  First, Intel has not presented any testimony or documentary evidence from Mr. Heller that would suggest an intent to deceive.  Second, Intel does not point to any evidence suggesting that Mr. Grunberger believed that the issued claims were not supported by the written description.  Nor does Intel demonstrate that Mr. Grunberger could have arrived at such a conclusion.  Mr. Grunberger testified at deposition that when performing patent prosecution work for PACT, he primarily communicated with Pietruk, a German patent attorney—not the inventor Martin Vorbach. SoF ¶ 106.  Intel does not point to any communication between Mr. Grunberger and Mr. Pietrek that demonstrate an intent to deceive.

E.    **Intel Cannot Establish That Mr. Vorbach Committed Inequitable Conduct By Failing to Submit His and Rambus' Emails Regarding Lack of Inventorship and Lack of Support for the Asserted Claims**

Intel alleges that Mr. Vorbach committed inequitable conduct by withholding emails from 2009 authored by him and Rambus allegedly acknowledging that he was not the inventor of the asserted claims and that the claims were not supported by the specification. *See* SoF ¶ 112.  As discussed above, Intel alleges that the a 2009 email from PACT's negotiating partner Rambus shows that Rambus believed there was no written description support for general purpose, multi-core processors in PACT's patent applications. But is undisputed that Rambus and PACT signed a Letter of Intent one year later that would have given PACT a share of the patent royalties Rambus earned from licensing the patents-at-issue to Intel.  *Id.* ¶ 113.  This licensing provision reflects Rambus' ultimately conclusion that PACT's portfolio would be applicable to Intel's

microprocessor products, and thus that they must have written description support for general purpose, multi-core processors. In any event, Intel does not provide any authority suggesting that an adverse negotiating party's allegations about validity can be used to impute knowledge or intent to inventors or that PACT had a duty to disclose this email to the Patent Office.

## VIII.   CONCLUSION

Plaintiff respectfully asks the Court to grant summary judgment and estop Defendant from raising invalidity grounds at trial against the asserted claims of the '631, '908, '047, and '301 patents based on the P6, Power4, TMS, NUMA-Q, and Excalibur systems (alone or in combination with other prior art patents known to Defendant at the time it filed its IPRs). PACT also requests that the Court grant its summary judgment motions with respect to Defendants' affirmative defenses related to marking ('301 and '047 patents), Covenant Not To Sue, Intel's breach of contract counterclaim, exhaustion, equitable estoppel, and inequitable conduct.

Dated: June 21, 2022

Respectfully submitted,

FARNAN LLP

By: */s/   Brian E. Farnan*

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Frederick A. Lorig (*Pro Hac Vice*)
fredericklorig@quinnemanuel.com

QUINN EMANUEL
URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel : (213) 443-3047

Mark Tung (*Pro Hac Vice*)
marktung@quinnemanuel.com
QUINN EMANUEL
URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Tel.: (650) 801-5016

Ziyong Li (*Pro Hac Vice*)
seanli@quinnemanuel.com
QUINN EMANUEL
URQUHART &
SULLIVAN, LLP
50 California Street, 22nd
Floor
San Francisco, CA 94111
Tel.: (415) 875-6600

Ron Hagiz (*Pro Hac Vice*)
ronhagiz@quinnemanuel.com
QUINN EMANUEL
URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
Tel.: (212) 849-7000

ATTORNEYS FOR PLAINTIFF
PACT XPP Schweiz AG

Dated: June 21, 2022